# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **MICHAEL BRADFORD BASS**<br>      **LA. DOC #543016** | **CIVIL ACTION NO. 3:13-cv-3134** |
| | **SECTION P** |
| **VS.** | |
| | **JUDGE ROBERT G. JAMES** |
| **WARDEN TIM KEITH** | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

*Pro* se Petitioner Michael Bradford Bass, an inmate in the custody of Louisiana's

Department of Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28

U.S.C. § 2254 on November 25, 2013. [doc. # 1].  Petitioner attacks his 2008 conviction for

attempted first degree murder and the twenty-year sentence imposed by the Fourth Judicial

District Court, Ouachita Parish.  This matter has been referred to the undersigned for review,

report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the

standing orders of the Court.

### Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit

Court of Appeal as follows:

> On June 25, 2007, at approximately 5:00 p.m., officers with the Monroe Police
> Department responded to a multiple car accident that occurred at a busy intersection
> in Ouachita Parish. Corporal Doug Lambert, one of the responding officers, was
> investigating the driver of the vehicle who caused the initial collision, Ginny
> Ettredge. Based on his experience and training, he determined that Ettredge was
> driving under the influence, and placed her in his patrol car in order to direct his
> attention to the collision and resulting traffic jam.
>
> Several bystanders informed Corporal Lambert that they had seen a man approach
> Ettredge's vehicle and take a black bag from the car. He then left in his red Mercedes
> convertible. Corporal Lambert noted the information but continued with his

investigation because this person was no longer present. Shortly thereafter, the same individual returned in the red Mercedes convertible and signaled to Corporal Lambert. As Corporal Lambert approached the red Mercedes, he realized that this man, who was later identified as Michael Bradford Bass, was the same man that removed the black bag from Ettredge's vehicle.

Corporal Lambert looked down and saw a black bag on the passenger seat of the man's car.  As he went to grab the bag, Bass pulled the bag in the opposite direction, causing Corporal Lambert to fall into the car. Bass accelerated the vehicle, with Corporal Lambert still inside, whereupon a police chase ensued. The car ultimately came to a stop after crashing into a brick building.  Bass was subsequently arrested and the black bag was taken into evidence.

*State v. Bass*, 47 So. 3d 541, 542-43 (La. App. 2 Cir. 2010).

On July 26, 2007, a Ouachita Parish Grand Jury indicted Petitioner on charges of attempted first degree murder, obstruction of justice, possession of cocaine with intent to distribute, and possession of methylenedioxymethamphetamine.  [doc. # 14-1, p. 25].  On February 19, 2008, Petitioner's trial counsel filed a Motion to Quash and a Motion to Suppress. [doc. # 14-3, p. 45, 47].  On August 5, 2008, the trial court conducted a hearing on Petitioner's motions and the State presented the following evidence:

At the hearing, the state called its first witness, Corporal Lambert. He testified that on June 25, 2007, at approximately 5:00 p.m., he responded to a traffic accident involving a city bus at a busy intersection in Ouachita Parish.

Corporal Lambert testified that as he approached one of the vehicles involved in the accident, a dark blue Saturn, he observed that the driver, Ginny Ettredge, appeared to be under the influence and lethargic. When Corporal Lambert began to inquire about her insurance, the defendant, Michael Bass, approached and began to answer his questions. Corporal Lambert identified the defendant in open court as the same individual who approached him on that date. Because it appeared that DUI charges might arise, Corporal Lambert placed Ettredge in the back of his patrol car for further questioning.

Several bystanders then motioned to Corporal Lambert to come over and talk to them. One bystander, Russell Galyean, told Corporal Lambert that the defendant disregarded Ettredge's well being and searched the car frantically.  He then exited

2

with a black bag, which he placed in a red car and drove away. Galyean identified the defendant by name, as he was a previous employee of the defendant.

At this point, Corporal Lambert believed that because the red car was gone, there was nothing he could do with this information. He testified that he went to investigate another vehicle that was involved in the collision and was approached again by one of the bystanders who reiterated the black bag story. Lambert started to return to the Saturn, but was interrupted when he saw the defendant parked in a red Mercedes convertible nearby. The car was parked with the engine running and the top down. When he observed the defendant in the red car, he explained his thought process:

> Well, everything clicked. Because when ... when the eyewitness ... used the name "Bass" had taken the bag, it ... you know, it all kind of came together. This was the same guy that I had talked to about the insurance information and the towing company.  And it all dawned on me, this is the same guy. This is the guy that they're talking about.

At this point, Corporal Lambert testified that the defendant hollered something to the effect of "Hey, where's my girl?" Lambert approached the car on the passenger side to explain that Ettredge was in the back of the patrol car and to see if the black bag was visible in the defendant's car. Eventually, he was standing right next to the red convertible, with his thigh touching the passenger side door.

Corporal Lambert testified that when he saw the black bag in the passenger seat, he reached down to grab it. The defendant jerked the bag in the opposite direction, and in doing so, pulled Lambert into the car, head first. Simultaneously, the defendant hit the gas pedal and accelerated the vehicle at a high rate of speed.  Lambert repeatedly yelled at the defendant to stop the car, but to no avail. The defendant's only response [to] Lambert's pleas to stop was that "he could not go back" (to jail presumably).

The defendant continued at a high rate of speed, swerving back and forth in an attempt to throw Corporal Lambert from the car. Lambert testified that he reached down to the floor shifter and jerked it down to a low gear, which resulted in the car still going forward but the tires moving at a slower rate. Although the car was in a low gear, the defendant continued to accelerate in spite of Lambert's pleas. When Lambert looked up, the defendant was accelerating directly toward a telephone pole which, had it been struck, would have impacted the passenger side where Lambert was located.  Lambert was able to grab the steering wheel and veer the vehicle away from the telephone pole, whereupon the car spun around several times in the road.

Through the spinning, Corporal Lambert lost control of the wheel and following a brief pause, the defendant drove the Mercedes into a brick building at a high rate of speed. Lambert was thrown into the windshield as the car continued into the building.

3

The defendant attempted to reverse the car out of the building. However, the defendant's getaway was thwarted when he crashed his car into a patrol car parked behind him.

Although in a contorted position, Corporal Lambert was able to unholster and deploy his Taser into the defendant's side. Following a brief struggle, the defendant was arrested and handcuffed. The defendant took the bag with him but Lambert told the officers to secure the bag. As a result of this ordeal, Lambert testified that he suffered a contusion to his lower leg bone and ankle bone. He also testified that he believed he was going to be killed.

On cross, Corporal Lambert explained why he reached for the black bag in the defendant's convertible:

> Because in my opinion he had illegally removed the bag from what was a crime scene. I did not know if I would be able to get it back. I did not know even if I called a car and tried to have him stopped, if we would ever ... after that point if it would ... if we would be able to get control of it again.
>
> . . .
>
> I was afraid that whatever was in the bag was what she was on that had led her to ... to be in the condition that she was in to be driving. I didn't know if it was drugs for sure.  It could have been a bottle of vodka.  It could have been anything. I just didn't know. I just know he wasn't supposed to take it from the car.

Corporal Lambert testified that the area was considered a "crime scene" because it was apparent that Ms. Ettredge was driving under the influence. Because of how small the black bag was, when the defendant attempted to get the bag back from Corporal Lambert, he inadvertently or intentionally, grabbed part of the officer's hand.

Next, the state called Summer Nicole Neilsen, who lived at the Mary Lea Apartments, which faced the accident scene. After hearing the loud crash, Neilsen testified that she went outside and observed the following:

> I saw the red car ... the Mercedes pull in. And at the time I saw Mr. Bass get out of his car, after he had parked it at the apartment across from me, walk over to the blue vehicle and went to the passenger side, removed a black bag and came back to his car and went into ... and went inside the apartment and then came out a few seconds later and left.

Neilsen knew the defendant prior to the day of the accident and identified him in open court. She did not observe any law enforcement officers during the time that the

4

defendant removed the bag and entered the apartment. According to her, the defendant arrived within seconds following the accident and the police arrived shortly after he entered the apartment. Neilsen observed Corporal Lambert approach the defendant in the red Mercedes and when the officer reached into the car, the defendant immediately drove off with the tires screeching and causing smoke.

The state's next witness was Russell Galyean, who also lived in the Mary Lea Apartments. Galyean arrived home soon after the accident occurred. Upon arriving at the complex, he walked to the street where the accident occurred. Galyean testified that he observed the defendant walk up to the blue Saturn and remove a black bag from the car. Galyean knew the defendant, because he had worked for him in the past, and he identified him in open court. The defendant was a car salesman and Galyean was hired as an employee at the defendant's business. Galyean was asked to leave after he failed to sell any cars. He testified that the circumstances surrounding his termination were "fine" and that he understood why he had been let go.

Galyean testified that he alerted Corporal Lambert to the defendant's removal of the black bag from the Saturn. Galyean later observed Corporal Lambert speaking to the defendant while he was in the red Mercedes. Thereafter, Lambert reached into the car and the defendant accelerated the vehicle causing the tires to screech and the car to take off with the officer on top. At this point, the state introduced into evidence the statement from Galyean which detailed the information he provided to Corporal Lambert on the date of the accident.

Next, the state called Corporal Reginald Brown with the Monroe Police Department. Corporal Brown responded to Corporal Lambert's request for assistance at the accident scene. Brown testified that he spoke with Ettredge, whose speech was slurred and that it was apparent she was under the influence. While speaking with Ettredge in the police car, Brown saw Lambert reach into the defendant's car for the black bag and the defendant "grab him and yank him in." Then, he could only see white smoke from the tires and Lambert partially inside the car as it sped away.

Corporal Brown followed the defendant in his patrol car whereupon he observed the Mercedes spin around several times before running into the building. At this point, Brown told the defendant to stop, but the defendant attempted to back the car out of the building. Brown identified the defendant in open court.

According to Corporal Brown, after he blocked the Mercedes with his patrol car, the defendant exited the vehicle and attempted to walk away. A struggle ensued and Brown was not able to subdue the defendant without assistance from other officers. Brown testified that he could not recall whether or not the defendant exited the vehicle with the black bag.

5

The state's next witness was Officer Scotty Sadler with the Monroe Police Department. He testified that when he arrived, Corporal Brown had already placed the defendant in handcuffs. Sadler identified the defendant in open court. He testified that after the defendant was detained, he was told by Corporal Lambert to retrieve the black bag. Officer Sadler located the bag and secured it in the trunk of a patrol car. Prior to doing so, Officer Sadler opened the bag and, based on his experience and training, observed what he believed to be a large quantity of crack cocaine.

Officer Sadler was approached by Russell Galyean who claimed to have witnessed the event. Sadler gave Galyean a piece of paper and asked him to provide his statement. Galyean returned the paper with his sworn statement to Officer Sadler. On cross, Sadler testified that while at the hospital where the defendant was examined, the defendant asked the officer to "tell that cop I didn't mean to hurt him."

At the conclusion of the hearing, the defense asked the court to suppress any evidence from the black bag and alleged that the bag itself was illegally seized from the defendant. The defense further argued that any arrests therefrom should also be suppressed. The trial court denied the motion and found that Corporal Lambert had probable cause to believe that the bag was evidence of a crime and, thus, had probable cause to detain the bag. The court noted that the witnesses were not anonymous tipsters.

The defense also argued that the defendant's actions were reasonable, and that he had the right to resist an unlawful arrest. The court held that there was no unlawful arrest, but there was a detention of a bag that was evidence in two crimes (the possible DWI and obstruction of justice). The court provided that the officers had probable cause to arrest the defendant on numerous occasions for the following crimes: obstruction of justice, battery of a police officer, and attempted murder of a police officer. Finding that the initial seizure and subsequent search and seizure were lawful, the trial court denied both the motion to suppress and motion to quash.

*Bass*, 47 So. 3d at 543-46.

On August 15, 2008, Petitioner vacated his plea of not guilty and pled guilty to the attempted first degree murder charge. [doc. # 15, p. 26]. The State, in exchange for Petitioner's plea, dropped the remaining charges. *Id.* at 11, 32. The trial judge accepted Petitioner's plea and sentenced Petitioner to twenty years at hard labor without benefit of probation, parole, or suspension of sentence. *Id.* at 28.

6

On January 11, 2010, Petitioner, via counsel, appealed and raised the following assignments of error: (1) the trial court erred in denying the motion to quash; (2) the trial court erred in denying the motion to suppress; and (3) the trial court erred in accepting Petitioner's guilty plea.  [doc. # 15-1, p. 31].  Petitioner also filed a *pro se* brief alleging the following assignments of error: (1) the rulings on the motions to suppress and quash were erroneous; (2) ineffective assistance of counsel; and (3) he was denied his right to a complete appellate review.  [doc. # 1-2, p. 105].  On August 11, 2010, the appellate court affirmed Petitioner's conviction. *Bass*, 47 So. 3d at 553.  The Louisiana Supreme Court denied Petitioner's application for writs on February 25, 2011.  [doc. # 15-3, p. 31].  Petitioner did not seek further direct review before the United States Supreme Court.

On April 20, 2011, Petitioner filed a *pro se* application for post-conviction relief in the trial court, raising three claims: (1) ineffective assistance of counsel; (2) the trial court failed to ensure that his guilty plea represented a knowing and voluntary waiver of rights; and (3) newly discovered exculpatory evidence that was not previously available.  [doc. # 15-3, p. 36-37].  The trial court denied Petitioner's application on April 9, 2012.  [doc. # 1-3, p. 65].

Petitioner sought further collateral review before the Second Circuit Court of Appeal on April 19, 2012.  [doc. # 15-4, p. 1].  On July 12, 2012, the Second Circuit denied Petitioner's application for relief.  [doc. # 15-5, p. 1].  The Louisiana Supreme Court likewise denied Petitioner's application on January 25, 2013.  [doc. # 15-6, p. 49].

Petitioner filed the instant Petition on November 25, 2013, requesting relief for the following claims: (1) ineffective assistance of counsel; (2) the State withheld exculpatory evidence;(3) the trial court erred in accepting his guilty plea because the plea was unknowing,

7

involuntary, and unintelligent; and (4) the trial court erred in accepting his guilty plea before

determining whether there was a significant factual basis for his plea.  [doc. # 1-1].

The matter is now before the undersigned.

### Law and Analysis

**I.      Standard of Review – 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254,

governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims.

After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is

limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398

(2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting

*Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as

opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-

court decision."  *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court

may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## II.    Petitioner's Claims

A. Claim One: Ineffective Assistance of Counsel

Petitioner alleges that his trial counsel was ineffective for failing to "competently advise him [as] to the elements of the offense and law surrounding his guilty plea," failing "to competently investigate potential defenses in his case and use powerful exculpatory evidence which would negate the specific intent element," and failing to adequately cross-examine Corporal Lambert at a pre-trial hearing.  [doc. # 1-1, p. 10-11].

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254.  *See Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012); *Amos v. Thornton*, 646 F.3d 199 (5th Cir. 2011). Substandard advice of counsel rises to a constitutional violation only if the substandard conduct deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right.  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him.  *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other

prong need not be considered.  *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs

of the test also need not be analyzed in any particular order.  *Goodwin v. Johnson*, 132 F.3d 162,

172 n.6 (5th Cir. 1997).  Further, "mere conclusory allegations in support of a claim of ineffective

assistance of counsel are insufficient to raise a constitutional issue."  *Green v. Johnson*, 160 F.3d

1029, 1042-43 (5th Cir. 1998).

     In applying the first prong of *Strickland*, a court should presume that the attorney's

actions are encompassed within the wide range of reasonable competence and fall under the

ambit of trial strategy.  *See Strickland*, 466 U.S. at 689-90.  The petitioner must show that the

performance of counsel fell "outside the wide range of professionally competent assistance."  *Id.*

at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).  To establish prejudice, the second prong

of *Strickland*, in the context of a guilty plea, "the defendant must show that there is a reasonable

probability that, but for counsel's errors, he would not have pleaded guilty and would have

insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

     i. <u>Failure to Inform Petitioner of the Consequences of Pleading Guilty</u>

     Petitioner argues, essentially, that trial counsel erroneously informed him that if he pled

guilty he would still be able to appeal the trial court's prior denial of his pre-trial motions to

quash and suppress.  [doc. # 1-1, p. 10].  He argues that the appellate court refused to

meaningfully review his appeal with respect to the pre-trial motions because, as the appellate

court stated,  Petitioner "was not convicted of possession of controlled dangerous substances,

which is the main issue in both the motion to quash and the motion to suppress."  *Bass*, 47 So. 3d

at 548-49.  As mentioned above, the State dropped all but the attempted first degree murder

charge against Petitioner in exchange for Petitioner's plea.

10

Petitioner contends that his "counseled decision to accept a plea agreement, whereby he would maintain his right to appeal [the trial court's] denial of his pre-trial motions was his primary consideration in taking the "best interest" plea under *Crosby¹* . . . ." [doc. # 1-1, p. 12]. Thus, according to Petitioner, he would not have pled guilty if he had known that he would be unable to appeal the trial court's ruling. *Id.* at 11.

What Petitioner neglects to mention, however, is that the appellate court did reach the merits of Petitioner's assignments of error with respect to the pre-trial motions. *Bass*, 47 So. 3d at 14.   The appellate court stated, "[n]evertheless, part of the plea agreement provided that the defendant maintained his right to challenge the rulings so we will discuss these assignments of error in this opinion." *Id.*  The court went on to hold that the motions to suppress and quash were properly denied. *Id.* at 16.

With that said, the Court notes that there was a considerable chance that the appellate court could have declined to address Petitioner's assignments of error because Petitioner assigned error to the trial court's decision with respect to charges that were eventually dropped. While the appellate court did honor Petitioner's plea agreement, there still remains the primary issue of whether Petitioner would have accepted the plea agreement if he had known that there was a chance that the appellate court could so decline.  Upon consideration, the Court finds that this was not a reasonable probability because it is clear that Petitioner's decision to plead guilty was not wholly dependent on his right to appeal the trial court's ruling.

As Respondent states, "Petitioner never alleged any special circumstance that might

---

¹ *State v. Crosby*, 338 So. 2d 584, 586 (La. 1976), held that while a plea of guilty normally waives all non-jurisdictional defects in the proceedings prior to the plea, a defendant may nonetheless reserve his right to appeal an adverse prior trial court ruling.

support his claim that he placed particular emphasis on his appellate rights." [doc. # 14, p. 16].

In contrast, it appears that Petitioner accepted the plea bargain, in part, because he believed that

the testimony of the State's witnesses would be strong and that a jury would rule against him.

For instance, Petitioner stated that the testimony of the witnesses who testified at the hearing on

the pre-trial motions "was part of the reason why I think I'm accepting the plea . . . ." [doc. # 15,

p. 18]. He stated, similarly, that he wanted to plead guilty due to "the facts and the

overwhelming odds of the people that have come before the Court . . . ." *Id.* at 15. Petitioner

also stated that a guilty plea was in his best interest because he was concerned that a jury might

not believe his version of events. *Id.* at 25. Finally, again as Respondent states, "it is clear that

Petitioner was anxious to plead to a specific amount of time of incarceration rather than risk an

unknown greater amount of time in order to 'be able to see them (his two children) one day.'"

[doc. # 14, p. 17].

 The Court questions the veracity of Petitioner's argument that, if he had known that he

could not appeal the dropped charges, he would have chosen to face all charges rather than

pleading guilty and facing only one charge. It seems highly unlikely that any defendant would

risk being found guilty on multiple charges when the defendant had the option of accepting a deal

to drop all but one charge, only because that defendant could not appeal rulings related to the

dropped charges. In short, it is unlikely that any defendant would wish to maintain his or her

right to appeal dropped charges.

 All of this is to say that, even had the appellate court declined to rule on petitioner's

appeal of the trial court rulings, Petitioner would likely have accepted the plea agreement

regardless of counsel's alleged insufficient advice regarding the reservation of his right to appeal

the trial court's ruling on his motions.  Petitioner has failed to show that, but for counsel's

alleged errors, there was a reasonable probability that he would not have pled guilty and would

have instead insisted on proceeding to trial. Of course, the appellate court did in fact rule on his

appeal of the trial court's rulings, and therefore this claim is both factually and legally without

merit.[2]

    ii. Failure to Investigate

      Petitioner contends that trial counsel failed to investigate and uncover numerous pieces of

evidence that tended to negate any allegation that Petitioner acted with specific intent to kill or

inflict great bodily harm upon Corporal Lambert.  [doc. # 1-1, p. 13].  He contends that the

evidence would have shown that his behavior constituted nothing more than an "accident."  *Id.*

Specifically, he argues that counsel failed to investigate a civil proceeding that Corporal Lambert

instituted against Petitioner that contained various instances of Lambert referring to the incident

as an accident.  *Id.*

      In a guilty plea setting, "where the alleged error of counsel is a failure to investigate or

---

    [2] In his Reply, Petitioner seems to imply that his plea agreement constituted a contract
and that the appellate court breached the contract when it declined to review his assignments of
error with respect to the trial court's ruling on the two pre-trial motions.  [doc. # 16, p. 16].  It
could also be said that Petitioner is arguing that he did not consent to the plea agreement or that
the plea agreement was based on the State's fraud due to the fact that he "pled guilty with the
express understanding that he would be allowed to appeal the denial of [the] pre-trial motions . . .
."  *Id.* at 18.  First, the Court finds that these arguments fail to assert any constitutional violation.
The Court underlines that, "[i]n conducting habeas review, a federal court is limited to deciding
whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v.
McGuire*, 502 U.S. 62, 68 (1991).  To the extent that Petitioner argues that his guilty plea was
involuntary or unknowing, see Section II(C) *infra*.  Second, the Court reiterates that the appellate
court did review the merits of Petitioner's assignments of error and found that the trial court's
ruling was proper.  *Bass*, 47 So. 3d at 14.  Thus, the appellate court did not breach the plea
agreement and the State committed no fraud.

discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Hill*, 474 U.S. at 59.

Here, Petitioner essentially argues that, had counsel informed him of the civil proceeding, he would not have pled guilty.  However, Petitioner fails to show that he, or counsel, was unaware of the civil proceeding prior to pleading guilty.  In fact, Petitioner admits that he was aware of the civil proceeding and associated filings when he states that he was served with the civil petition on June 26, 2008, which was well before his August 15, 2008, guilty plea.  [doc. # 1-1, p. 15].  Petitioner goes on to concede that he forwarded a copy of the civil suit to his trial counsel.  *Id.* Tellingly, Petitioner even admits that his trial counsel "assured [him] that he would investigate the 'accident' as officer Lambert was calling it." *Id.* at 15-16.  Thus, it is clear that both Petitioner and his counsel were aware of the evidence that counsel allegedly failed to uncover.  In addition, Petitioner presents no evidence to suggest that counsel failed to investigate the evidence as he informed Petitioner he would.  In effect, there is no "likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea" because counsel did discover the evidence. *See Hill*, 474 U.S. at 59.

Instead of arguing that counsel failed to investigate or uncover exculpatory evidence, perhaps Petitioner is arguing that counsel was ineffective for advising him to take the guilty plea without first explaining to him that Corporal Lambert's references to an accident could serve to negative any allegations that Petitioner acted with specific intent.  However, this ostensible

14

argument is unavailing because the following colloquy between Petitioner and the trial judge

makes clear that Petitioner understood both the nature of his charges and the concept of specific

intent:

> Court.  The Bill of Information does charge, in Count 1, that on or about June the 25th, 2007, you willfully and unlawfully attempted to commit first degree murder of an officer, Douglas W. Lambert, with the Monroe Police Department, contrary to the provisions of RS 14:27 and 14:30, Subsection 3.  Let me read those statutes to you so you know what those are.
>
> Petitioner.  Yes, sir.
>
> Court.  14:30-it says first degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm upon more than one person.  Do you understand that?
>
> Petitioner.  Yes, sir.  I do have a question if I may.  What's the difference between first degree and second degree?
>
> Court.  First degree has some aggravating circumstances, what we call aggravating circumstance, okay.  It may be, for example, one of them is I kill someone who's over the age of–I think it's sixty-five, okay?
>
> Petitioner.  Okay.
>
> Court.  And our society, the legislature, says that's an aggravated–we're not going to have it as a second; we're going to move it up to first.  Also another one is if I--
>
> Petitioner.  It was always my understanding it was premeditated, which was meaning that you planned before but I guess–I'm not a lawyer.  I don't know.
>
> Court.  That's TV.  You don't have to plan it, just something you may do.  Just all of the sudden decide.  I can just all of the sudden see someone that I didn't even know was going to be in this courtroom and decide I'm going to kill them and I pull out a gun and shoot them.
>
> Petitioner.  Okay.
>
> Court.  Didn't know they were going to be in my courtroom at all.
>
> Petitioner.  Okay.

Court.  And say I'm going to shoot them and kill them dead.

Petitioner.  I did not know that.

Court.  That would be murder and if I did it because they were a fireman; just suppose I hate firemen and they're protected in here also, somewhere, and I'll get to that in just a minute.

Petitioner.  I'm aware of that.

Judge.  For purposes of peace officer, that includes any constable, marshal, deputy marshal, sheriff deputy, sheriff, or local or state policeman, so maybe it's a wildlife and fishery agent and I think that I don't like them and they walk in–didn't know they were going to be here.  I pull out my rifle and shoot them dead; I intend to kill them and I shoot them dead then that would be first degree murder instead of second degree murder.  Now, if they're just an average Joe Blow citizen walks in the door and I say I don't like the way he looks and kill him, that would be second degree murder.

Petitioner.  Okay.  So the fact that it's a peace officer makes it-

Judge.  In this case, yes.

Petitioner.  Okay.

* * *

Petitioner.  Okay.  Thank you for your explanation, Your Honor.

Judge.  So, in this case, first degree is when the offender has specific intent to kill and it's a police officer is where you're under; do you understand that?

Petitioner.  Yes, sir, I do.

Judge.  Now, you're charged with an attempt and let me tell you what 27 says.  Attempt: any person having specific intent to commit a crime does or admits an act of the purpose of intending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended and shall be immaterial whether under the circumstances he would have actually accomplished his purpose; do you understand that?

Petitioner.  Yes, sir, I do.  I do.

16

Judge.  Okay.  And I will tell you that an attempt is a separate but lesser grade of the intended crime and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such a person in pursance of such an attempt.  Do you understand that?

Petitioner.  Did you say there's a difference between intent and attempt?  Is that--

Court.  No, on that I was saying an attempt is a separate but lesser grade of the intended crime.

Petitioner.  Okay, I see.  And homicide as opposed to attempted homicide.

Court.  Right.

Petitioner.  Is that correct?

Court.  And, well, for example, one that we'll all understand; I distribute cocaine to you.  I can be guilty of an attempt–they can plead me to an attempt even though did I actually distribute to you and sell to you?  Yes.  It's a lesser crime.

Petitioner.  Okay.

Court.  And even the facts show I actually committed the crime, I can plead to an attempt okay?

Petitioner.  Okay, I see.  Thank you.

[doc. # 15, p. 21-23].

Overall, it is clear that Petitioner, a college graduate, was well-aware of all the facts and circumstances that he alleges trial counsel failed to uncover, and that he was also aware of how those facts and circumstances applied with respect to the concept of specific intent.  Yet, even being so aware, Petitioner still made the choice to plead guilty.  Petitioner has again failed to show that, but for counsel's alleged errors, he would not have pled guilty and would have instead insisted on proceeding to trial.  This claim is without merit.

    iii. <u>Failure to Cross-Examine</u>

17

Petitioner briefly argues that trial counsel failed to adequately cross-examine Corporal Lambert at the pre-trial hearing.  [doc. # 1-1, p. 16].  Petitioner argues that trial counsel, "armed with a copy of [Corporal Lambert's civil lawsuit], inexplicably failed to cross-examine Officer Lambert's contentions in the civil petition that the 'attempted murder' was in fact the result of negligent conduct by [Petitioner]."  *Id.*

Petitioner fails to demonstrate that counsel's decision not to ask specific questions or pursue certain defense strategies when questioning Corporal Lambert was not part of a reasonable trial strategy.  As the Supreme Court explained in *Strickland*: "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Strickland*, 466 U.S. at 689.  Further, "a defense counsel's trial strategy, which would include his asking or refraining from asking certain questions of witnesses, does not reach constitutional proportions."  *U.S. v. Hughes*, 635 F.2d 449, 452 (5th Cir. 1981).  Petitioner fails to establish the deficiency prong of *Strickland*, especially when, as here, counsel did cross-examine the witness.  [*See* doc. # 14-7, p. 43-61].

Petitioner has failed to demonstrate that he received ineffective assistance of counsel.  Accordingly, it is recommended that Petitioner's ineffective assistance of counsel claims be **DENIED**.

B. Claim Two: *Brady* Violation

Petitioner claims that the State withheld exculpatory evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  [doc. # 1-1, p. 18].  However, the Fifth Circuit has held that a guilty plea forecloses a petitioner's *Brady* claim.  *U.S. v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009) (citing *Matthew v. Johnson*, 201 F.3d 353 (5th Cir. 2000); *Orman v. Cain*, 228 F.3d 616 (5th Cir. 2000)).  In *Matthew*, the Fifth Circuit stated:

> Because a Brady violation is defined in terms of the potential effects of undisclosed information on a judge's or jury's assessment of guilt, it follows that the failure of a prosecutor to disclose exculpatory information to an individual waiving his right to trial is not a constitutional violation.

*Matthew*, 201 F.3d at 361-62.  Similarly, as explained in *Orman*, "*Brady* requires a prosecutor to disclose exculpatory evidence for purposes of ensuring a fair trial, a concern that is absent when a defendant waives trial and pleads guilty."  *Orman*, 228 F.3d at 617.  Here, because Petitioner pled guilty, his claim should be **DENIED**.

C. Claim Three: Guilty Plea

Petitioner claims that his guilty plea was unknowing, involuntary, and unintelligent because the trial court, Petitioner's counsel, and the State "actively misrepresented the collateral consequences of the plea."  [doc. # 1-1, p. 24, 27].  He claims that he was erroneously informed that he could appeal the trial court's denial of his two pre-trial motions to quash and suppress and, if the appellate court disagreed with the trial court's ruling, that he would be afforded a new trial.  *Id.* at 26-27.  According to Petitioner, "[t]he net effect is that [he] was advised to take a meaningless plea grounded in an unfulfillable [sic] promise both from the trial court and his attorney.  [doc. # 1-1, p. 27].

19

The test for determining a guilty plea's validity is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill*, 474 U.S. at 56 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).  Courts examine all of the relevant circumstances when applying this test.  *Brady v. U.S.*, 397 U.S. 742, 749 (1970).

A defendant pleading guilty must be competent, *see Brady*, 397 U.S. at 756, and must have notice of the nature of the charges against him, *see Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976).  The plea must not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant," or of state-induced emotions so intense that the defendant was rendered unable to rationally weigh his options with the help of counsel. *Brady*, 397 U.S. at 750.  In addition, "[a] guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void." *Machibroda v. U.S.*, 368 U.S. 487, 493 (1962).  A defendant must also understand the consequences of his plea and the nature of the constitutional protections he is waiving.  *Henderson*, 426 U.S. at n.13.

Here, Petitioner does not allege that he was incompetent, that he did not have notice of the nature of the charges against him or the constitutional protections he was waiving, that he was threatened with actual or mental harm, or that the plea was the product of state-induced emotions so intense that he was rendered incapable of rationally weighing his options.  At best, Petitioner argues that his plea was induced by a promise that was not kept or that he did not understand the consequences of his plea.  With that said, however, Petitioner's arguments are belied by the record and by his own statements at the plea hearing:

20

Court.  My job is not to talk you into this plea nor talk you out of this plea; you have the right to accept the plea bargain that greatly reduces your exposure however, before I can accept this plea, three things I must do.  The law says I must make sure you understand the charge you're pleading guilty to, that you understand the rights you're giving up by entering this plea, and that you understand the consequences of the plea.  If I say anything–if I use a word or legal term or a legal theory or legal right that you do not understand one hundred percent, I want you to stop me, get me to go over it with you.  Will you do that?

Petitioner.  Yes, sir.

Court. And if you don't stop me, can we agree that means that you understood everything I said one hundred percent?

Petitioner.  Yes, sir.

\* \* \*

Court.  Anything to prevent you from understanding the rights I'm about ready to go over with you?

Petitioner.  Absolutely not.

\* \* \*

Court.  You understand today you wish to give up your right to plead not guilty, give up your right to trial by judge or jury, give up the right to have your attorney represent you at trial, even though he's representing you here today, and that today you have decided to enter a plea of guilty to attempted first degree murder that occurred on or about June the 25th, 2007, and accept a sentence of twenty years at hard labor without benefit of probation, parole, or suspension of sentence, reserving your *Crosby* plea.

\* \* \*

Petitioner. Yes, sir.

Petitioner.  I have a question.

Court.  Go ahead.

Petitioner.  The motion that you ruled on on the 5th and the witnesses that came and that spoke before the Court, in the event that we appeal those motions, would [trial counsel] still be able to cross-examine those witnesses?

Court.  You're saying that once you appeal my ruling on your two motions, if the Court of Appeals reverses it and sends it back for another trial, then would you have a right to question those witnesses?

Petitioner.  Well, I think, in my mind, I'm trying to understand because to me, their testimony was part of the reason why I think I'm accepting the plea, however, I didn't understand that–if we went before another Court, a higher Court, and my attorney was to find that their testimony was inaccurate; would that have any effect on me being sentenced today–do you understand what I'm trying to say?

Court.  No, I don't understand.  I will tell you--

Trial Counsel.  Once we take the appeal up, we cannot introduce any more evidence than we have now but, if we point out the various inconsistencies as we see them in the testimony of the various witnesses, if the Court of Appeals agrees and sees those same inconsistencies and feels that Judge Clark was incorrect in his rulings, then this plea goes away and then we have a trial or we work something out or whatever.

Petitioner.  I think that's kind of what I'm trying to say.  Does that make sense?

Court.  Well what I want to make sure is that you understand that by pleading guilty today, you're giving up all these rights--

Petitioner.  I understand that.

Court.  –except you're reserving the right to take the record, not add to it, take the record as it is, it will get transcribed, it will go up in a big volume of everybody that testified at those hearings, and only what happened at that hearing will go up and they will review it and they will see if under the law they agree with me or disagree.

Petitioner.  I absolutely understand that.

* * *

Court.  The only thing where you're different than most people where I usually end like that but on yours, you do still reserve your *Crosby* appeal, which is the appeal of your Motion to Suppress and your Motion to Quash; do you understand that?

Petitioner.  Yes, sir, I do.

22

Court.  Bottom line is if you plead guilty, you will not have a trial, thus you'll be giving up all the rights I just went over with you.  Have you fully understood, one hundred percent, all the rights I've gone over with you?

Petitioner.  Yes, sir.

Court.  Understanding those rights, do you wish to give those rights up and maintain your plea of guilty?

Petitioner.  Yes, sir.

* * *

Court.  So you understand the charge to which you're charged with and you're pleading guilty to it?

Petitioner.  Yes, sir, I do.

* * *

Court.  Now, has anyone threatened you in order to get you to enter this plea?

Petitioner.  No, sir.

Court.  Has anyone promised you anything to get you to enter this plea?

Petitioner.  No, sir.

Court.  Everything that influenced your decision to plead guilty has been told to be on the record in front of everyone here today?

Petitioner.  It was my decision.  I'm a grown man.

Court.  Listen to my words carefully, okay?  Think about it and answer truthfully.  Everything that influenced your decision to plead guilty, has it been told to be on the record in front of everyone here today?

Petitioner.  Yes, sir.

* * *

Court.  You said something a few minutes ago and that's my next question: whose decision was it to plead guilty?

23

Petitioner.  It's my decision.

* * *

Court.  But you're telling me it's your decision to plead guilty; is that correct?

Petitioner. Well, yes, sir; it's definitely my decision.

Court.  Any complaints whatsoever?

Petitioner.  No, sir, I'm just sorry it all happened.

Court.  Well, I think everyone is.  Once again, has anyone threatened you in any way?

Petitioner.  No, sir.

Court.  Now, I have observed you as you've answered these questions.  I believe that you have knowingly and intelligently entered this plea and that you clearly understand the charge which you're pleading guilty to; am I correct about that?

Petitioner.  Yes, sir.

Court.  That you clearly understand the consequences of your plea; am I correct about that?

Petitioner.  Yes, sir.

Court.  And that you understand the rights you're giving up and have decided to waive those rights and enter a plea of guilty; am I correct about that?

Petitioner.  That is correct, Your Honor.

Court.  To the charge of attempted first degree murder, how do you plead?

Petitioner.  Guilty.

[doc. # 15, p. 13-26].

As is evident, Petitioner unequivocally admitted that no individual promised him anything in exchange for his guilty plea and that he fully understood the consequences of his plea.  To the extent that the trial judge's statement that Petitioner would be able to appeal the trial

24

court's ruling on Petitioner's two pre-trial motions can be considered a promise in exchange for Petitioner's plea, that promise was fulfilled when the appellate court reviewed the trial court's ruling. *See Bass*, 47 So. 3d at 14. Similarly, to the extent that Petitioner claims he did not understand the consequences of his plea, the Court observes that the consequences that Petitioner accepted and admitted that he understood proved to be the exact consequences that occurred (i.e. Petitioner was afforded meaningful appellate review of the trial court's ruling). The Court, to this end, agrees with Respondent's statement that "[t]he fact [that] Petitioner did not win his appeal does not change his plea into anything other than what it [was]: a free and voluntary admission of guilt made after he was fully advised of the charges and the consequences of the plea." [*See* doc. # 14, p. 24]. Petitioner's claim should be **DENIED**.

D. Claim Four: *Alford* Plea

Petitioner's final claim alleges that the trial court erred in accepting his guilty plea before conducting an *Alford* inquiry. [doc. # 1-1, p. 27, 29]. Under *Alford*, when a defendant proclaims innocence "but pleas guilty anyway, due process is satisfied only if the state can demonstrate a 'factual basis for the plea.'" *Orman*, 228 F.3d at 621 (citing *Alford*, 400 U.S. at n.10). But, "absent statements inconsistent with guilt, state courts are not constitutionally required to establish a factual basis for the plea of guilt." *Banks v. McGougan*, 717 F.2d 186, 188 (5th Cir. 1983). In that vein, even an assertion that a petitioner is entering a plea specifically under *Alford* does not constitute a claim of innocence or a "statement inconsistent with guilt" sufficient to trigger the need for a court to ascertain the factual basis for the plea. *Orman*, 228 F.3d at 622. A sentencing court is not required to ascertain whether a defendant believes in his innocence;

rather, a defendant must assert his innocence and put the court on notice that there may be some need to inquire into the plea's factual basis.  *Id.* at 621.

Petitioner claims that he effectively proclaimed his innocence because he "never expressly admitted his guilt at any time during the lower court proceedings."  [doc. # 1-1, p. 29]. He also urges that, when he stated that he considered the plea to be in his best interest, the plea transformed into an *Alford* plea.  Respondent, in response, claims that Petitioner's plea colloquy demonstrates that Petitioner expressly admitted guilt and never maintained his innocence.  [doc. # 14, p.25].  Respondent also argues that any reference to Petitioner's "best interest" is immaterial and has no bearing on the issue.  *Id.*

The following exchange took place at the plea hearing:

Court.  The factual basis for the plea, as I understand it, is exactly [as] I heard in the Motion to Suppress and Motion to Quash.

Trial Counsel.  That's correct, Your Honor.

Court.  Okay.

The State.  Yes, Your Honor.

Court.  The factual situation.

The State.  That's correct.

Court.  Is that correct, Mr. Bass?

Petitioner.  Yes, sir.

Court.  The Court does find that there is a factual basis for the plea.  Now, [trial counsel], this plea you feel is in your client's best interest?

Trial Counsel.  Yes, sir.

Court.  And, Mr. Bass, you had told me earlier you felt it was in your best interest; is that correct?

Petitioner.  Yes, sir, considering the other circumstances, yes, sir.

Court.  And, I think as you put it earlier, that if the jury believes the testimony that I heard at the hearing and doesn't believe your version then they--

Petitioner.  I'd never see my children again.

Court.  And so in other words, this is in your best interest.

Petitioner.  Absolutely.

* * *

The State.  Your Honor, while you're looking, let me just make a comment.  I'm not sure I heard you correctly; I did note this was a best interest plea but this is not a plea that is subject to the provisions of Alford.

Court.  This is correct.

Petitioner.  May I ask what that is?

Court.  I'm sorry?

Petitioner.  May I ask what the Alford is?

Court.  Alford's just a plea that has nothing to do with this case.

Petitioner.  Okay.  The reason I ask is an attorney had mentioned that to me, the Alford plea, and he had recommended it but I never had found out what it was.

Trial Counsel.  The word he was actually using involved a Crosby plea.

Petitioner.  Okay.  It might have just misspoke.

[doc. # 15, p. 24-25, 29].

The Second Circuit Court of Appeal held that Petitioner did not maintain his innocence and that *Alford* was not triggered.  *Bass*, 47 So. 3d at 551.  Even supposing that Petitioner did

27

proclaim innocence, the appellate court noted held that "[t]he judge, defense counsel, the state, and the defendant all agreed that the factual basis for the plea is that which was set forth during the hearing on the motions to suppress and quash." *Id.* at 550-51.  As to Petitioner's argument that declaring that his plea was a "best interest" plea transformed it into an *Alford* plea, the appellate court stated, "such an argument is meritless as the defendant did not maintain his innocence during his plea." *Id.* at 551.[3]

This Court agrees and finds that Petitioner never expressly proclaimed innocence or made any statements inconsistent with guilt.  To the contrary, Petitioner readily admitted guilt at the plea hearing.  Thus, it was not unreasonable for the Second Circuit to reject Petitioner's claim. Petitioner's claim should be **DENIED**.

<u>Conclusion</u>

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of *habeas corpus* filed by Petitioner Michael Bradford Bass, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response

---

[3] Petitioner cites what he describes as a "long line of [Louisiana] case law regarding the 'best interest' plea as being synonymous with an *Alford* plea."  [doc. # 1-1, p. 33].  However, Petitioner fails to cite to any United States Supreme Court authority to that effect.

28

or request for extension of time shall be furnished to the District Judge at the time of filing.

Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 30th day of April, 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE